# In the United States Court of Federal Claims

OXY USA INC.,

     and

CITGO PETROLEUM CORPORATION,

    *Plaintiffs,*

v.

THE UNITED STATES,

    *Defendant.*

No. 19-694C
(Filed: November 17, 2022)

Contract; Motion to Dismiss;
RCFC 12(b)(1); RCFC
12(b)(6); Summary Judgment;
Anti-Assignment Act;
Liability

---

*Daniel M. Steinway*, Washington, DC, for Plaintiffs.

*Matthew Paul Roche*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge*.

    This case concerns a series of contracts involving Plaintiffs OXY USA Inc. ("Oxy") and CITGO Petroleum Corporation ("Citgo," together the "Oil Companies") and the United States government related to the production of high-octane aviation gasoline and butadiene, a synthetic rubber product, during the 1940s. *See* Compl. ¶¶ 1–2, ECF No. 1; Pls.' Opposition to Def.'s Renewed Mot. to Dismiss and Renewed Cross-Motion ("Pls.' Cross Mot.") at 5, ECF No. 49.

    During the Second World War, the federal government contracted with multiple petroleum companies for the production of critical wartime commodities, such as aviation gasoline ("avgas") and butadiene. Many of these contracts contained language that the government would reimburse the petroleum companies for various costs, including taxes or property liability. In the intervening half-century, several of these petroleum companies have incurred significant environmental cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and state law equivalents. *See* 42 U.S.C. § 9601 *et seq.* This has spawned considerable litigation over the breadth of indemnification claims by the petroleum product manufacturers. *See, e.g.*, *Shell Oil Co. v. United States*, 7 F.4th 1165 (Fed. Cir. 2021) (deciding res judicata issue and damages interest) ("*Shell Oil III*"); *Shell Oil Co. v. United States*, 896 F.3d 1299 (Fed. Cir. 2018) (deciding

damages) ("*Shell Oil II*"); *Shell Oil Co. v. United States*, 751 F.3d 1282 (2014) (deciding liability) ("*Shell Oil I*"); *E.I. Du Pont de Nemours & Co. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004) ("*DuPont*"); *Chevron USA Inc. v. United States*, 155 Fed. Cl. 344 (2021); *Exxon Mobil Corp. v. United States*, Nos. 09-165C, 09-882C (consolidated) (J. Lerner).

In this case, the plaintiff oil companies Oxy and Citgo seek indemnification. This is the second time that the Government moved to dismiss Plaintiffs' contract claims and that Plaintiffs cross-moved for partial summary judgment as to liability. For the reasons set forth below, the Government's motion is **DENIED IN PART** and **GRANTED IN PART**, and Plaintiff's cross motion is **DENIED IN PART** and **GRANTED IN PART**.

## I.   Background

### A.   Factual Background

#### 1.   The Avgas Contract

After the United States joined World War II, Congress granted the executive branch expansive authority to overhaul the nation's petroleum industry in support of the war effort. *See* Compl. Ex. D at 5, ECF No. 1-6 (Plaintiffs' claim letter). As part of the mobilization, the Reconstruction Finance Corporation ("RFC"), an early predecessor to the General Services Administration, established the United States Defense Supplies Corporation ("DSC") "to procure critical wartime-related commodities." Compl. ¶ 7. Avgas was one such commodity. *Shell Oil III*, 7 F.4th at 1167 ("Avgas became the most critically needed refinery product," and the federal government "recognized the need to quickly mobilize avgas production.") (quoting *Shell Oil II* 896 F.3d at 1303 and *Shell Oil I*, 751 F.3d at 1286) (quotation marks omitted); *see* Compl. Ex. D at 5.

In 1942, the DSC entered into a multi-year avgas production contract ("the Avgas Contract") with Cities Service Refining Corporation ("Cities Service"), an early-20th Century oil company. Compl. ¶ 8. The Contract required "'maximum' quantities of avgas" and imposed specific directives over price. Compl. Ex. D at 5 (noting that the government "told the refiners what to make, how much of it to make, and what quality"). Petroleum manufacturers typically agreed to the expanded production requirements and artificially low profit margins of these wartime contracts because agencies like the DSC agreed to reimburse the manufacturers for a wide range of potential production liabilities. *See Shell Oil III*, 7 F.4th at 1167; *see also* Compl. ¶ 10.

Under the Avgas Contract, the DSC agreed to pay "any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which [Cities Service] *may be required by any municipal, state, or federal law* in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder [i.e., Avgas]." Compl. ¶ 10 (citing Ex. A at 11). Pursuant to the Avgas Contract, Cities Service produced avgas for the government at the Lake Charles Refinery in Lake Charles, Louisiana, from 1942 until the war ended in 1945. *Id.* ¶¶ 11–12; Pls.' Cross Mot. at 24.

2

2.        **The Right of Way Agreement**

Like avgas, synthetic rubber was another commodity crucial to the mobilization effort. Similar to the DSC, the RFC established the United States Rubber Reserve Company to contract with the petroleum industry for the private production of synthetic rubber and related rubber materials such as butadiene, a raw material used in the manufacture of synthetic rubber for tires and tubes.  Compl. ¶ 16; *see* Compl. Ex. D at 6–7, 7 n.16, 9 (describing butadiene as a "key synthetic rubber raw ingredient[]").  These rubber production contracts followed a systematic procedure.  The government typically acquired a site and built a government-owned war production plant—known as a "plancor"—which it then leased to a private manufacturer to operate.  Compl. Ex. D at 4, 6.  The government would then purchase the entire output of the plant through an operating agreement, as well as impose strict production directives and limitations on sales.  *Id.* at 6–7, 7 n.16.

Accordingly, in 1942, the Rubber Reserve Company contracted with Cities Service to produce butadiene at the government-owned Butadiene Plancor 706 located near the Lake Charles Refinery.  Compl. ¶ 8; *see* Compl. Ex. B, ECF No. 1-4 (Rubber Reserve Operating Agreement).  Under the butadiene production agreement (the "Operating Agreement"), Cities Service agreed to produce butadiene.  Compl. Ex. B at 2–3; Compl. Ex. D at 9; Compl. ¶ 20.  The government also leased Cities Service Butadiene Plancor 706, signing a Butadiene Lease contract (the "Butadiene Lease" or "Lease").  *See* App. ("CFC-Appx") at CFC-Appx45.  Plant construction ended, and production started, in 1944.  Compl. Ex. D at 9.

Due to wartime demands, the government quickly built Butadiene Plancor 706 "without adequate waste processing facilities."  *Id.*  Plaintiffs explain that the plant was "hastily constructed to meet the pressures of wartime needs," which caused significant contamination with "significant, unintended impacts."  Pls.' Cross Mot. at 6; Compl. ¶¶ 20–21.  During the war, the RFC did not divert funds or manpower to process waste.  Compl. ¶ 23.  In 1946, shortly after the war ended, it commissioned a report on Butadiene Plancor 706's waste impact, which documented the significant environmental effect caused by the plant's toxic waste.  *Id.*; *see also* Compl. Ex. D at 9.

In December 1946, RFC and Cities Service entered into a new agreement—the Right of Way Agreement ("ROW Agreement")—to dispose of waste generated at the government-owned, Cities Service-operated Butadiene Plancor 706.  Compl. ¶ 24.  Under the Agreement, Cities Service "agreed to grant an easement and right-of-way to RFC" at the Lake Charles Refinery for the construction of a "Butadiene Plant Effluent Disposal System."  *Id.*; *see* Compl. Ex. D at 9–10; *see also* Compl. Ex. C, ECF No. 1-5 (ROW Agreement).  This system encompassed "an RFC-owned pipeline to carry wastes generated by Butadiene Plancor 706 for disposal in a waste unit—known as the 'Surge Pond'—that was located at the Lake Charles Refinery."  Compl. ¶ 24.

Like the Avgas Contract, the ROW Agreement included indemnification language.  It expressly provided that:

Grantee [RFC] agrees to construct and maintain said pipe line in such condition that the escape of any products transported therein shall be prevented and should

3

the property of grantor or any other corporation, person or firm be injured or destroyed thereby *grantee also agrees to assume and pay all damages resulting therefrom*, *and grantee also agrees to indemnify grantor* for losses, claims, demands and suits for damages to property and injury to or death of persons, including court costs and attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted.

Compl. Ex. C at 2 (emphasis added); *see also* Compl. ¶ 27.

Pursuant to the ROW Agreement, Cities Service produced butadiene at the plant starting in 1944. Compl. Ex. D at 9. The federal government continued to own, and Cities Service continued to operate, Butadiene Plancor 706 until it was sold to a Cities Service joint venture in 1955. *Id.*; Compl. ¶ 2.

### 3.     Intervening Years

Over the past eighty years since production of avgas and butadiene commenced, Cities Service's corporate structure transformed through a variety of corporate mergers, re-organizations, and re-brands. First, in 1955, RFC sold Butadiene Plancor 706 to a joint venture made up of Cities Service's parent company and Continental Oil Co., called Petroleum Chemicals, Inc. ("PCI"). Def.'s Renewed Mot. to Dismiss ("Def.'s Mot.") at 6, 12, ECF No. 46; *see also* Compl. Ex. D at 7–8.

Then, in 1963, Cities Service itself underwent a series of changes. It first merged into Cities Service Petroleum Corporation, which later changed its name to Cities Service Oil Company. Def.'s Mot. at 8; Pls.' Cross Mot. at 8. This company then merged into Cities Service Company ("CSC"). Def.'s Mot. at 8; Pls.' Cross Mot. at 8. Cities Service Company then again merged with Occidental Merger Corporation, a special-purpose entity created as a subsidiary of Occidental Petroleum Corporation ("Occidental") specifically for the purpose of a merger. Def.'s Mot. at 8; Pls.' Cross Mot. at 8; June 24, 2020 Hr'g Tr. at 8–10, ECF No. 32. Cities Service Company survived this merger and became a subsidiary of Occidental. Def.'s Mot. at 8; Pls.' Cross Mot. at 8; June 24, 2020 Hr'g Tr. at 8–10.

In 1982 and 1983, Cities Service Company formed two new subsidiaries and spun off some of its assets. First, in 1982, Cities Service Company established a wholly-owned subsidiary, Cities Service Oil and Gas Corporation ("CSOGC"). Def.'s Mot. at 8; Pls.' Cross Mot. at 9. Cities Service Company assigned this new entity certain assets, including the Butadiene Plancor 706 plant. Def.'s Mot. at 8; Pls.' Cross Mot. at 9. This company was later renamed OXY USA, Inc.—the first plaintiff in the instant case. Def.'s Mot. at 9; Pls.' Cross Mot. at 9.

Second, in 1983, Cities Service Company formed another subsidiary, Cities Service RMT Corporation ("CSRMT"). Def.'s Mot. at 9–10; Pls.' Cross Mot. at 8–9. The parent then reorganized and transferred almost the entirety of its assets in the "Petroleum Products Group," a business group, to the Cities Service RMT Corporation subsidiary. Def.'s Mot. at 9–10; Pls.' Cross Mot. at 9–11; *see* CFC-Appx130–36 (Restated Assignment and Assumption Agreement

transferring assets).[1]  This transfer included Cities Service Company's "refining, marketing, and transportation assets," which encompassed the Lake Charles Refinery, as well as the Avgas Contract, ROW Agreement, and other rights.  Pls.' Cross Mot. at 8–9.  Cities Service RMT Corporation was later renamed Citgo—the second plaintiff.  *Id.* at 9.  Citgo has continued to own and operate the Lake Charles Refinery.  *Id.*[2]

After these corporate transfers, Oxy retained possession of Butadiene Plancor 706 and Citgo retained possession of the Lake Charles Refinery, which included rights under the Avgas Contract and was the grantor of the ROW Agreement.  *See* Pls.' Cross Mot. at 8–9; Def.'s Mot. at 8–10.  According to Plaintiffs, Oxy also retained rights under the ROW Agreement as the owner of Butadiene Plancor 706.  Pls.' Cross Mot. at 29–30.  Oxy explains that "the indemnification provided under the ROW Agreement, and the rights thereunder, initially inured to CSC's benefit as both (1) the owner of the Lake Charles Refinery (the property through which CSC granted the easement), *as well as* (2) the operator/lessee of the Plancor 706 under the Lease . . . which was eventually assigned to CSOGC (and later OXY USA)."  Pls.' Sur-Reply at 4, ECF No. 66 (citing CFC-Appx123).

### 4.    Intervening Environmental Contamination

Cities Service's production of avgas and butadiene caused significant waste at both the Lake Charles Refinery and Butadiene Plancor 706, which had its waste transported to the Lake Charles Refinery Surge Pond through the Effluent Disposal System constructed over the butadiene plant's right of way.  Compl. ¶ 24.

Avgas is a blend of ordinary gasoline, petroleum distillates, and chemical additives like alkylate, a high-octane gasoline component produced using sulfuric acid.  *Shell Oil III*, 751 F.3d at 1288.  One of the by-products of avgas production is spent alkylation acid, which is reprocessed into sulfuric acid, used to produce other petroleum products, or discarded as waste.  *Id.*  During the war, few facilities processed spent alkylation acid, and few railcars could be diverted to allow for transportation of the spent alkylation acid for reprocessing.  *Id.*  Therefore, many of the oil companies involved in avgas production dumped and burned their acid waste.  *Id.*  Predictably, this resulted in extensive environmental destruction and litigation for cleanup costs under both CERCLA and state law.  *Id.* at 1288–89.

Since the mid-century, Plaintiffs' refining operations have been involved in regular environmental contamination cleanup efforts.  Operation of the refinery and plant, in part under

---

[1]  The parties' appendix materials are filed at ECF Nos. 46-2, 46-3, 49-2, 56-1, and 66-2.

[2]  In 1983, Southland Corporation acquired all outstanding stock in what became Citgo through a stock purchase agreement between Occidental, Cities Service Company, and Cities Service RMT Corporation.  Def.'s Mot. at 11 (citing CFC-Appx150–519).  Per this agreement, Southland Corporation (which appears to have later rebranded to 7-Eleven, Inc., the chain of retail convenience stores) acquired all business "in Cities' refining . . . operations . . . including, but not limited to, the ownership, operation and/or maintenance of the Lake Charles Refinery."  *Id.* (citing CFC-Appx164).

the war contracts and in part in the following years, "generated a wide range of hazardous wastes," including:

> (1) slop oil, oil emulsions, acid sludge, spent acids, separator sludge, tank bottoms, and other waste materials generated from the Refinery operations; and (2) oil emulsions, copper ammonium acetate, clarification sludge, boiler blowdown and lime slurry waste, acetylene polymer waste, spent sulfuric acid, spent caustic soda, and acetone waste generated at the Butadiene Plancor.

Compl. Ex. D at 10.  Both Oxy and Citgo have "implemented a continuous, uninterrupted program to address various areas of contamination at the Lake Charles Complex." *Id.*  They attribute much of the waste to effluent discharge from Butadiene Plancor 706 at the Surge Pond and from operations at the Lake Charles Refinery, or at the plant itself due to production. *Id.* at 11.  Both companies have also incurred orders under CERCLA, Louisiana state law, and state-imposed environmental directives to undertake cleanup actions.  Compl. ¶ 30.  The Plaintiffs allege that they have sustained approximately $94,000,000 in costs through December 2016, "and will continue to incur substantial additional response costs for the foreseeable future." *Id.* ¶ 32.  Cleanup at Lake Charles is ongoing.

### B.   Procedural Background

On May 10, 2019, following denial of their certified demand to the GSA, Oxy and Citgo jointly filed a Complaint against the United States.  Compl. ¶ 33; *see* Compl. Ex. D.  They assert that the "United States is required to indemnify and reimburse Plaintiffs for their incurred cleanup costs" at the Lake Charles Complex.  Pls.' Cross Mot. at 5, 6.  Plaintiffs allege three counts.  Under the first two counts, the Oil Companies assert breach of contract claims under the Contract Settlement Act of 1944 related to the United States' refusal to pay or reimburse Plaintiffs for cleanup costs under the Avgas Contract.  Compl. ¶¶ 35–39, 40–47.  In their third count, Plaintiffs assert a breach of contract claim under the Contract Disputes Act related to the United States' refusal to reimburse costs under the ROW Agreement.  *Id.* ¶¶ 50–56.[3]

This is the Government's second motion to dismiss Plaintiffs' Complaint.  *See* Def.'s Mot. to Dismiss, ECF No. 9; Def.'s Amended Mot. to Dismiss, ECF No. 11.  Judge Bruggink of the Court of Federal Claims dismissed both the first motion and Plaintiffs' first cross motion without prejudice, ruling that further discovery on Plaintiffs' rights under the contracts and related to the asset transfers was required.  *See* June 26, 2020 Order, ECF No. 26 (denying motions without prejudice); June 24, 2020 Hr'g Tr. at 33:17–25 (Judge Bruggink ordering further discovery on corporate history), 35–36 (denying motions without prejudice).

Following Judge Bruggink's Order, the parties undertook additional discovery.  On September 24, 2021, the Government again moved to dismiss, and Plaintiffs filed a Cross

---

[3]  Plaintiffs' Complaint also included two claims—Counts III and IV—related to production of rubber under the Rubber Reserve Contract.  *See* Compl. ¶¶ 41–49.  Plaintiffs withdrew these claims in the prior motion to dismiss briefing.  *See* Pls.' Resp to Def.'s Amended Mot. to Dismiss at 1–2, ECF No. 15; Def.'s Mot. at 1 n.1.

Motion for Partial Summary Judgment as to the United States' liability under both the avgas and butadiene war contracts.  *See* Def.'s Mot.; Pls.' Cross Mot.  On February 28, 2022, the case was transferred to the undersigned.  *See* Feb. 28, 2022 Order, ECF No. 59.  Oral argument was held on October 3, 2022.  *See* Oct. 3, 2022 Hr'g Tr. at ECF No. 70.

## II.     Legal Standards

### A.     Subject Matter Jurisdiction

Subject matter jurisdiction is a threshold issue.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); Rules of the United States Court of Federal Claims ("RCFC") 12(h)(3).  Jurisdiction over a suit against the federal government also "requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citations omitted).

The Tucker Act is a basis for subject matter jurisdiction and contains such a waiver.  *Id.* Under the Tucker Act, the Court of Federal Claims has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  But because the Tucker Act only waives sovereign immunity and does not itself create substantive rights, a plaintiff must also identify a separate source of law that can be fairly interpreted as creating a right to money damages.  *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)).  An allegation of a contract and breach of that contract can act as a right to money damages when monetary relief is sought.  *See Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990).

### B.     Standards of Review

The Government filed a motion to dismiss under RCFC 12(b)(1) and 12(b)(6).  *See* Def.'s Mot.  The burden of proving jurisdiction in a motion to dismiss under RCFC 12(b)(1) typically lies with the plaintiff seeking to invoke the court's jurisdiction.  *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).  When a party challenges the truth of the jurisdictional facts alleged in the complaint, the court determines whether the plaintiff has established jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Additionally, the court may "inquire into jurisdictional facts" outside of the pleadings to determine whether it has jurisdiction.  *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

For a motion to dismiss under RCFC 12(b)(6), the Court evaluates whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Am. Bankers Ass'n v. United States*, 832 F.3d 1375, 1380 (Fed. Cir. 2019).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)).

Finally, Plaintiffs filed a cross motion for summary judgment under RCFC 65(a). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *E.g.*, *Alamanza v. United States*, 935 F.3d 1332, 1336–37 (Fed. Cir. 2019) (citing *FastShip, LLC v. United States*, 892 F.3d 1298, 1302 (Fed. Cir. 2018)); *see also* RCFC 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute over such a fact is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of demonstrating the absence of a genuine dispute of material fact and must establish its position by "citing to particular parts of materials in the record." RCFC 56(c)(1)(A). All justifiable inferences are drawn in the non-movants favor, *Alamanza*, 935 F.3d at 1336, and "any doubt over factual issues will be resolved in favor of the non-moving party." *Jaster v. United States*, 86 Fed. Cl. 731, 733 (2009) (citing *Mingus Contractors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987)).

## III.    Discussion

### A.    Subject Matter Jurisdiction Under the Anti-Assignment Act

The Government first moves to dismiss the Complaint because Plaintiffs failed to establish jurisdiction in light of the Anti-Assignment Act's bar on assigning government contracts, as "neither plaintiff was a contracting party." Def.'s Mot. at 14. Indeed, the original contracts—the Avgas Contract, Rubber Reserve Contract, and ROW Agreement—were signed by the federal government and Cities Service, not the plaintiff Oil Companies.

Generally, courts treat Anti-Assignment Act disputes under the typical Rule 12(b)(1) motion to dismiss framework. *See, e.g.*, *DDS Holdings, Inc. v. United States*, 158 Fed. Cl. 431, 436, 439 (2022); *L-3 Commc'ns Sys., LP v. United States*, 84 Fed. Cl. 768, 775–76 (2008); *Johnson Controls World Servs. v. United States*, 44 Fed. Cl. 334, 340 (1999). Under this framework, the Court reviews "evidence extrinsic to the pleadings" to analyze whether the plaintiff has proven jurisdiction by proving an exception to the Anti-Assignment Act. *DDS Holdings*, 158 Fed. Cl. at 436, 439 (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) (granting the defendant's motion to dismiss for lack of subject matter jurisdiction because "plaintiff demonstrated neither outright privity of contract with the government nor a valid assignment of any claims that would constitute the necessary privity.")).

However, the Court of Federal Claims has occasionally held that, "[f]or the purposes of jurisdiction, a plaintiff need merely show that a contract with the government underlies the claim." *Liberty Ammunition, Inc. v. United States*, 101 Fed. Cl. 581, 586–87 (2011); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("A well-pleaded

allegation in the complaint is sufficient to overcome challenges to jurisdiction."). This position is supported by the Federal Circuit, which "has unambiguously held that 'jurisdiction under the Tucker Act requires no more than a non-frivolous allegation of a contract with the government.'" *Liberty Ammunition*, 101 Fed. Cl. at 586–87 (emphasis removed) (quoting *Engage Learning Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011)). Consequently, when analyzing a Rule 12(b)(1) motion to dismiss based on the Anti-Assignment Act, the court in *Liberty Ammunition* held that "[t]he actual existence of a contract is not a jurisdictional matter but rather a decision on the merits of the case." *Id.* (citing *Engage Learning*, 660 F.3d at 1354–55). Under this formulation, Plaintiffs' claims would survive dismissal because both parties recognize that a contract with the government occurred.

But while the Federal Circuit has not clearly categorized Anti-Assignment Act violations as a jurisdictional bar, it has discussed the Act's impact on the waiver of sovereign immunity and privity of contract. "[T]here must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998), *cert. denied, sub nom.*, *Sherman Park Apartments v. United States*, 528 U.S. 820 (1999). "The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity," which implicates a plaintiff's standing. *Id.*; *see also Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract."); *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005), *cert. denied, sub nom.*, *Martin v. United States*, 548 U.S. 904 (2006) ("[S]tanding and privity of contract with the government are questions of subject matter jurisdiction.").

Furthermore, the Federal Circuit has clarified that "the Tucker Act must be read to waive sovereign immunity for assignees . . . except as barred by a statutory provision such as the Anti-Assignment Act." *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001). It follows that if the Anti-Assignment Act bars the sovereign immunity waiver provided by the Tucker Act, there is no privity of contract with the government, and no jurisdiction under the Tucker Act. *See First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("The lack of privity impacts the lack of waiver of sovereign immunity, which is available pursuant to the Tucker Act."); *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Absent privity between [plaintiff] and the government, there is no case.").

Notably, the Federal Circuit has corrected trial courts for dismissing contractual claims on jurisdictional grounds in cases not involving the Anti-Assignment Act. *See Brach v. United States*, 443 F. App'x 543, 547 (Fed. Cir. 2011). But it has not done so when the Anti-Assignment Act is implicated. *See Steppe v. United States*, 945 F.2d 416, at *1 (Fed. Cir. 1991) (unpublished) (agreeing with the lower court that the Anti-Assignment Act robbed the appellant of standing); *see also Wall Indus., Inc. v. United States*, 10 Cl. Ct. 82, 86 (1986) (noting that "the only issue remaining in controversy is that of jurisdiction (§§ 7422 and 6511 of 26 U.S.C. and the Anti-Assignment Act, 31 U.S.C. § 3727)"). Therefore, the Anti-Assignment Act stands to bar this Court's jurisdiction. Accordingly, Plaintiffs cannot merely assert the existence of a

government contract to establish jurisdiction; each Plaintiff must prove their assignments' validity by a preponderance of the evidence.  *See Reynolds*, 846 F.2d at 748.

### 1.    The Anti-Assignment Act's Jurisdictional Bar

The Anti-Assignment Act consists of two statutory acts, 31 U.S.C. § 3727 and 41 U.S.C. § 15, that "invalidate assignments of government contracts unless specific conditions are met."  *Ham Invs., LLC v. United States*, 388 F. App'x 958, 960 (Fed. Cir. 2010); *see Tuftco Corp. v. United States*, 614 F.2d 740, 744 n.4 (Ct. Cl. 1980) (describing differences between each statute).  Section 3727 of Title 31 prohibits the assignment of claims, whereas Section 15(a) of Title 41 prohibits the assignment of contracts.  *See L-3 Commc'ns*, 84 Fed. Cl. at 776 (citing *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 892 (Fed. Cir. 2008)).  The statutes define assignment as "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim."  31 U.S.C. § 3727(a)(1).  Under the Act, "[t]he party to whom the Federal Government gives a contract or order may not transfer the contract or order, or any interest in the contract or order, to another party."  41 U.S.C. § 6305(a).  Any transfer made against this prohibition "annuls the contract or order so far as the Federal Government is concerned."  *Id.*

The statutes have two broad policy rationales.  First, the Act aims to prevent individuals from buying up claims against the United States to influence government officers.  *Tuftco Corp.*, 614 F.2d at 744 (quoting *Spofford v. Kirk*, 97 U.S. 484, 490 (1878)).  Second, "it is inferred [that] Congress sought to enable the United States to deal exclusively with the original claimant instead of several parties," which helps avoid confusion related to multiple areas of liability.  *Id.* (quoting *Patterson v. United States*, 354 F.2d 327, 329 (1965)) (internal quotation marks omitted).  Both of these goals share the common theme of preventing the United States from suffering injury.  *L-3 Commc'ns*, 84 Fed. Cl. at 777 (citing *Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657 (1921)).  Accordingly, "the Act does not restrict assignments where there is no probability that the United States could suffer injury."  *Id.* at 778.

### a.    Consent Exception

While the Anti-Assignment Act was originally read to invalidate all assignments, multiple exceptions are now well-recognized.  *See Tuftco Corp.*, 614 F.2d at 745 (collecting cases).  Here, the parties disagree whether these exceptions prevent the Avgas Contract and ROW Agreement assignments from Cities Service to Oxy and Citgo in their present forms.  "[T]he Government, if it chooses to do so, may recognize an assignment."  *Id.* (citing *Maffia v. United States*, 143 Ct. Cl. 198, 203 (1958)); *see also Christian & Assoc. v. United States*, 160 Ct. Cl. 1, 10, *cert denied*, 375 U.S. 954 (1963)).  The Act is "interpreted as being solely for the Government's own benefit and therefore as permitting the Government to assent to and recognize an assignment where it seems appropriate."  *Christian & Assoc.*, 160 Ct. Cl. at 10 (collecting cases).

### b.  The Operation of Law Exception

The Act will also not restrict assignments when the assignment occurs "by operation of law." *Tuftco Corp.*, 614 F.2d at 745.  This exception to the Anti-Assignment Act occurs "when transfer of a claim or contract is effected by consolidation or merger to the successor of a claimant corporation." *Id.* (quoting *Seaborn Air Line Ry.*, 256 U.S. 655); *see also Liberty Ammunition*, 101 Fed. Cl. at 589.  It "generally involves situations where, for all intents and purposes, the contract with the Government continues with essentially the same entity, which has undergone a change in its corporate form or ownership." *L-3 Commc'ns*, 84 Fed. Cl. at 777 (citing *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 569 (2003), *aff'd*, 97 F. App'x 931 (Fed. Cir. 2004)).  This exception also permits assignments "[w]here a transfer is incident to the sale of an entire business or the sale of an entire portion of a business." *Id.* (*citing Lyons Sec. Serv. Inc. v. United States*, 38 Fed. Cl. 783, 786 (1997)).  Some courts have described this as an "*in toto*" acquisition of the entirety of a business or business unit.  *See id.* at 771.  However, full sale of a business is not required, and the Court of Federal Claims has upheld assignments under the operation of law exception when "substantially all of the company's assets and liabilities were transferred." *Lyons Sec. Serv.*, 38 Fed. Cl. at 785.

The parties largely agree on the extensive background of corporate transactions and changes that resulted in Cities Service Refining Corporation's transition into Cities Service Company, a wholly-owned subsidiary of Occidental Petroleum.  *See* Def.'s Mot. at 8–13; Pls.' Cross Mot. at 8–20.  However, the parties disagree on the 1982–83 assignments that divided Cities Service Company between Cities Service RMT Corporation (later Citgo) and Cities Service Oil and Gas Corporation (later Oxy).

The Government argues that the 1982–83 assignments at issue were voluntary "asset transfers" where the "purported successor had acquired 'only a portion of the . . . business that had, in the past, performed certain services under the . . . contract.'"  Def.'s Mot. at 14, 16, 18 (citing *Westinghouse Elec.*, 56 Fed. Cl. at 569, 570 (holding that a corporate sale did not constitute a permitted assignment because the "entire [corporate] entity responsible for the [government contract] was not sold")).  The Government further contends that "[Cities Service] had attempted to assign all of its contractual rights associated with the Lake Charles refinery . . . and only some of its burdens under those contracts, to an entity which ultimately became CITGO." *Id.* at 16.  Similarly, it claims that "CSC unilaterally split contractual obligations between itself and CSOGC (later renamed OXY) and CSRMT (renamed CITGO), assigning only some obligations to the new entities." *Id.*

Defendant also highlights that "rather than identify the entity the plaintiffs consider the successor of the contracting party . . . they bring the claim on behalf of *both* OXY and CITGO, which suggests that plaintiffs are unsure whether the contracts here were part of an asset transfer to CITGO." *Id.* at 17.  It further questions how the assignments remained valid after the 1955 sale of Butadiene Plancor 706 to the PCI joint venture, noting that the ROW Agreement is a servitude that "runs with the land" and transferred to PCI as the new owner.  *Id.* at 2, 12.

11

Plaintiffs contest the Government's characterization of the assignments.  As for Citgo, the Oil Companies argue that it was transferred ownership of the Lake Charles Refinery as "part of a transfer of an entire portion of a business."  Pls.' Cross Mot. at 11 (citing *L-3 Commc'ns*, 84 Fed. Cl. at 777).  They point to the agreement signed between Cities Service Company and Cities Service RMT Corporation that "transferred all of CSC's Petroleum Products Group to CSRMT," which was a wholly-owned subsidiary.  Pls.' Cross Mot. at 12 (citing CFC-Appx130–31, 797, 800).  Such an assignment is akin to a "transfer of an entire portion of a business" because Cities Service Company "reorganized [and] transferr[ed] an entire division to CSRMT."  Pls.' Cross Mot. at 14 (citing CFC-Appx797, 800).  These rights to the Lake Charles Refinery included the rights under the Avgas Contract and the ROW Agreement.  The Oil Companies also argue that these transfers did not harm the Act's policy goals, as the transfers occurred decades after performance ended and have not caused duplicative litigation.  Pls.' Cross Mot. at 14–20.

As for the Oxy assignment, the Oil Companies claim that Oxy was also granted indemnification because of its ownership in Butadiene Plancor 706.  They argue that "[u]nder the ROW Agreement, the Government agreed to two fundamental obligations: (1) the Government agreed to 'assume and pay all damages' resulting from the construction and operation of the Butadiene Plant Effluent Disposal System, and (2) the Government agreed to indemnify Plaintiffs for 'losses, claims, demands and suits for damages to property and injury to or death of persons, including court costs and attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted.'"  *Id.* at 29–30 (cleaned up) (citing Compl. Ex. C at 2); *see also id.* at 20 (describing this as a right "to enforce Defendant's indemnity obligations under the RoW Agreement.").  According to Plaintiffs, the obligations authorize indemnification not only to Citgo as the owner of the Lake Charles Refinery where the Surge Pond is located, but also to Oxy as "operator/lessee" of the butadiene plant.  *Id.* at 21.  Moreover, Plaintiffs argue that the assignment between Cities Service Company and Cities Service Oil and Gas Corporation transferred "all assets of whatsoever kind of CSC," which included Butadiene Plancor 706 and "rights to enforce Defendant's indemnity obligations under the ROW Agreement."  *Id.* at 20 (citing CFC-Appx123).

## 2.  Assignment to Cities Services RMT Corporation (Citgo)

### a.  The Lake Charles Refinery Assignment to Cities Service RMT Corporation (Citgo) Falls Under the Operation of Law Exception.

Cities Service RMT Corporation was incorporated in 1983.  CFC-Appx799–800 (declaration of Jeff Bednar).  At the same time, Cities Service Company "separated its refining, marketing, and transportation operations from its other assets and operations, by transferring them to [CSRMT] pursuant to two Assignment and Assumption Agreements."  *Id.*  The second agreement, the Restated Assignment and Assumption Agreement, "grant[ed], convey[ed], assign[ed], and deliver[ed]" to Cities Service RMT Corporation:

> all assets of whatsoever kind of the Company that are necessary for the operation of the Refining, Marketing and Transportation Division of its Petroleum Products

Group . . . including but not limited to . . . [a]ll of the assets included on the books and records of the Company as assets of the Petroleum Products Group.

CFC-Appx130 (Restated Assignment and Assumption Agreement).  Other assets, such as trademarks and employees, were also transferred.  *See* CFC-App131–34 (Restated Assignment and Assumption Agreement).  As Plaintiffs explain, this transaction was "the consolidation and reorganization of the CSC entity between its refining, marketing, and transportation operations into one entity, and its upstream oil and gas operations into another entity, []the Cities Service Oil and Gas Corporation."  June 24, 2020 Hr'g Tr. at 11:13–19.

This assignment is not an *in toto* acquisition of the entirety of a business unit because some assets *outside* the refining, marketing, and transportation divisions of Cities Service Company's Petroleum Products Group were ostensibly left to the parent firm.[4]  *See L-3 Commc'ns*, 84 Fed. Cl. at 777 ("Where a transfer is incident to the sale of an entire business or the sale of an entire portion of a business, the transfer is considered to have occurred 'by operation of law.'") (quoting *Lyons Sec. Serv.*, 38 Fed. Cl. at 786); *see also Johnson Controls*, 44 Fed. Cl. at 336–37 (upholding transfer where all assets were transferred).  Nevertheless, the assignment was more akin to a "change in corporate identity" than a voluntary assignment in violation of the Act.  *Johnson Controls*, 44 Fed. Cl. at 343.

Courts ask whether "for all intents and purposes, the contract with the Government continues with essentially the same entity."  *L-3 Commc'ns*, 84 Fed. Cl. at 777.  Here, the reorganization between the parent and wholly-owned subsidiary ensured that the new entity continued with the same key management, assets, and financial resources to perform the government contract after the reorganization.  *See Johnson Controls*, 44 Fed. Cl. at 344; *see also Am. Gov't Props. v. United State*s, 118 Fed. Cl. 61, 68 (2014) (finding assignment to a new entity with new management and different finances violated the Act).  The assignment included "all rights and benefits" under related contracts and "all employees required to operate and service the assets and business activities being assigned and transferred," as well as a contribution of capital.  CFC-Appx131.  And while these assets did not include everything under the business unit, "substantially all" of Cities Service refining business in the Petroleum Products Group was transferred, with the same funding and management.  *Lyons Sec. Serv.*, 38 Fed. Cl. at 785.[5]

---

[4]  For this reason, Plaintiffs' assertion that the agreement "transferred all of CSC's Petroleum Products Group to CSRMT" appears mistaken.  Pls.' Cross Mot. at 12 (citing CFC-Appx130–31, 797, 800).

[5]  The Government stresses that the Restated Assignment and Assumption Agreement noted that "it is the desire of the Company [i.e., CSC] to transfer certain assets to the Subsidiary as a contribution of capital to the Subsidiary and to retain certain other assets in the Company."  Def.'s Reply at 6–7 (emphasis omitted) (citing CFC-Appx123).  But the "desire" of the company to transfer does not necessitate that the transfer was voluntary.

This finding also conforms with the Act's policy goals, which courts use as a stand-in for analysis. *See, e.g.*, *Johnson Controls*, 44 Fed. Cl. at 344 (highlighting the significance of the Act's policy goals and determining "[t]he Air Force was never subject to multiple or duplicative obligations and was always cognizant of the contracting party"); *L-3 Commc'ns*, 84 Fed. Cl. at 777 ("In the instant case, the sale . . . is precisely the type of corporate transfer which is not deleterious to the Government's interest.  The claim was passed to a single successor-in-interest."); *Am. Gov't Props.*, 118 Fed. Cl. 61, 68 ("The fact that the government is now sued by both entities is the best proof that the attempted assignment was problematic.").

The Act aims to prevent the United States from suffering duplicative litigation or multiple claims for liability, and otherwise "does not restrict assignments where there is no probability that the United States could suffer injury."  *L-3 Commc'ns*, 84 Fed. Cl. at 778 (citing *Seaboard Air Line Ry.*, 256 U.S. at 657); *see also Johnson Controls.*, 44 Fed. Cl. at 344.  At the time of the assignment in 1982, performance under the Avgas Contract had long been completed.  Even if the assignment was for less than Cities Service Company's entire refining business, there is little chance that Citgo's predecessor could interfere with contract performance.

Another chief policy goal of the Act is to minimize the impact of multiple claims against the United States.  *See Am. Gov't Props.*, 118 Fed. Cl. at 68.  The Government makes repeated arguments that this policy is violated here because there are two Plaintiffs, and thus two claims for liability.  *See* Def.'s Mot. at 19; Def.'s Reply in Supp. of Renewed Mot. to Dismiss and Resp. ("Def.'s Reply") at 11, ECF No. 56.  But only one of the Plaintiffs owned the Lake Charles Refinery, which served as the conduit for both the Avgas Contract and as grantor of the ROW Agreement for waste disposal at the Surge Pond.  The Act aims to prevent multiple claims for liability over the same claim, not the same set of facts.  Here, separate reimbursement claims exist under the Avgas Contract and ROW Agreement for Citgo.

The Government further argues that the Restated Assignment and Assumption Agreement "divided contractual liabilities and obligations between CSC and CSRMT."  Def.'s Mot. at 10; *see also* Def.'s Reply at 9 (citing CFC-Appx133).  It claims that split rights and obligations are substantively different from those in *L-3 Communications* and *Johnson Controls*, which did not feature any splitting of rights or obligations, nor any splitting of business groups.  But divided contractual rights would not challenge the finding that substantially all of the Petroleum Products group was assigned.  Nor does the Government identify any specific liability at the Lake Charles Refinery that was split or impacted just because other liabilities or obligations in the Restated Assignment and Assumption Agreement may have been divided.  The record supports the opposite: Through the Lake Charles Refinery, Cities Service RMT Corporation was granted "[a]ll rights and benefits of the Company under contracts which relate to the assts assigned," as well as "[a]ll of the Company's obligations under the contracts which

14

are assigned." CFC-Appx131–33. This encompassed the Lake Charles Refinery, and in turn, the Avgas Contract and ROW Agreement.[6]

Overall, the Anti-Assignment Act's primary inquiry "is whether one corporation is, *in fact*, the successor-in-interest of the other. . . . [T]he successor corporation must retain the same management and financial resources that its predecessor possessed." *United Int'l Investigative Servs. v. United States*, 26 Cl. Ct. 892, 898–99 (1992). "The retention of these resources adequately ensures that the government continues to receive the benefit of the management and financial responsibility for which it bargained." *Id.* at 899. Here, the assignment could not interfere with the government's agreement because the contract had long-ago ended and a surviving entity could still be held responsible. Cities Service no longer exists, but its ownership of the Lake Charles Refinery continues under Citgo.[7]

Accordingly, the Avgas Contract and ROW Agreement assignments to Citgo remain valid under the Anti-Assignment Act, and the Government's motion to dismiss these claims based on lack of subject matter jurisdiction is denied.[8]

### 3.   Assignment to Cities Service Oil and Gas Corporation (Oxy)

#### a.   The Butadiene Plancor 706 Assignment to Oxy Does not Fall Under the Operation of Law Exception.

Cities Service Oil and Gas Corporation was formed in Delaware in 1982. CFC-Appx797 (Charles Purser Declaration). In 1983, "certain oil and gas assets of [Cities Service Company]

---

[6] For the same reason, the later acquisition of Citgo from Southland Corporation does not change Citgo's indemnification rights under either agreement or divide liability. The Government describes a 1983 stock purchase agreement between Southland and Citgo. *See* Def.'s Mot. at 11. However, it never argues that this agreement assigned the contracts at issue, or otherwise demonstrates how this agreement implicates the Anti-Assignment Act. For example, the Government claims the agreement "assigned to Southland 'any and all businesses . . . including . . . the Lake Charles Refinery.'" *Id.* at 11 (citing CFC-Appx164). But Southland was not assigned the underlying contracts—it purchased the issued and outstanding capital stock of Citgo. CFC-Appx162–64. Ownership of the corporate entity does not necessitate assignment of the contract.

[7] Reinforcing that Citgo is the "successor-in-interest" of Cities Service, Citgo's website contains a corporate history that chronicles four decades of Cities Service history as part of its own corporate origin story. *See Our Heritage: The History of CITGO Through the Decades* (last visited October 20, 2022), https://www.citgo.com/about/our-history.

[8] Plaintiffs also argued that the government consented to the transfer of the ROW Agreement's indemnification rights to Citgo when it "prospectively consented to such assignments to subsidiaries and affiliates in the Butadiene Lease Contract." Pls.' Cross Mot. at 9. This argument is moot as to Citgo because its assignment is valid under the operation of law exception to the Anti-Assignment Act.

were transferred to its subsidiary CSOGC" through an Assignment and Assumption Agreement. *Id.*; *see* CFC-Appx123 (Assignment and Assumption Agreement). This agreement covered "all assets of whatsoever kind" of Cities Service Company, "less and except" reserved assets: the Petroleum Products Group, certain lands, and all assets in various business groups, including the Company's Gas Retail Section of the Natural Gas Liquids Division and the entire Metals Division. CFC-Appx123–24 (Assignment and Assumption Agreement). The agreement does not explicitly name what was transferred outside what was reserved, but it did include Butadiene Plancor 706. *See id.*; Pls.' Cross Mot. at 9. The many assets that remained at Cities Service Company were then either transferred to Cities Service RMT Corporation during the 1983 assignment or retained in a re-branded Cities Service Company (Cities Offshore Production Company), which later merged with Oxy in 1993. *See* CFC-Appx797.

Unlike the transfer to the entity that became Citgo, the assignment of assets to Cities Service Oil and Gas Corporation does not name an entity, business group, or business division that could be characterized as an assignment "incident to the sale of an entire business or the sale of an entire portion of a business," or as substantially all of a business unit. *L-3 Commc'ns*, 84 Fed. Cl. at 777; *see* CFC-Appx123–26; *see also Lyons Sec. Serv.*, 38 Fed. Cl. at 786. Rather, the Assignment and Assumption Agreement is a full grant riddled with exceptions that reads like a laundry list of corporate assets in transition, with no overarching theme or division. *See* CFC-Appx123–26. The litany of exceptions does not provide a basis for an *in toto* acquisition of a business unit, let alone a business group or smaller-defined subset. For Cities Service Oil and Gas Corporation, everything *but* the assets later sent to Cities Service RMT Corporation or otherwise retained in the parent were assigned. CFC-Appx123 (transferring "all assets of whatsoever kind of the Company, LESS AND EXCEPT, however, and reserving unto the Company" other assets).

It is also unclear whether the same employees, management structures, or financial controls were transferred to Cities Service Oil and Gas Corporation. *See Am. Gov't Prop.*, 118 Fed. Cl at 68 (highlighting the importance of having the same business structure in terms of employees and finances). The 1993 merger of Oxy and Cities Offshore Production Company—which comprised the final remaining assets of Cities Service Company—further underscores that the 1983 assignment was not "for all intents and purposes . . . essentially the same entity." *L-3 Commc'ns*, 84 Fed. Cl. at 777.

This transfer also fails under a policy-minded approach. First, the transfer poses no serious risk to contract performance. *See id.*, 84 Fed. Cl. at 777. By 1982, the government no longer owned Butadiene Plancor 706, and like avgas, government-directed butadiene production had ceased. But unlike the Avgas Contract, the ROW Agreement was designed for an ongoing Effluent Disposal System to the Surge Pond, not production. Stated differently, as an easement agreement and not a production contract, the end to butadiene production did not necessarily end the risk of contract performance.

The second policy implication—whether there are multiple litigants—is implicated here. Plaintiffs try to dodge this concern by characterizing the ROW Agreement as containing "two

fundamental obligations" from the government: (1) an agreement to "'assume and pay all damages' resulting from the construction and operation of the Butadiene Plant Effluent Disposal System"; and (2) an agreement "to indemnify Plaintiffs for 'losses, claims, demands and suits for damages to property and injury to or death of persons, including court costs and attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted.'" Pls.' Cross Mot. at 29–30 (citing Compl., Ex. C at 2). According to Plaintiffs, the ROW Agreement's indemnity provision provides reimbursement to Citgo as the owner of the Lake Charles Refinery (where the Surge Pond is located), and also to Oxy as "operator/lessee" of Butadiene Plancor 706 (the plant responsible for waste at the Surge Pond). *Id.* at 21. Plaintiff's argument is that while the *Shell Oil I* decision triggered indemnification for "any new or additional charges," the obligations under the ROW Agreement more broadly covered any costs "incident to or resulting from" use of the waste system. *Id.* at 30 (citing Compl. Ex. C at 2); *see Shell Oil I*, 751 F.3d at 1292. Therefore, according to Plaintiffs, this broader language covers costs created at Butadiene Plancor 706 after Cities Service bought the plant in 1955. Pls.' Cross Mot. at 30.

Plaintiffs' reimbursement argument is unpersuasive for multiple reasons. Initially, the indemnity provision does not "indemnify Plaintiffs," as the Oil Companies claim. *Id.* at 29–30. The provision stated: "[G]rantee also agrees to indemnify *grantor* for losses, claims, demands, and suits for damages." Compl. Ex. C at 2 (emphasis added). Oxy was neither grantee, nor grantor. The grantee was "the owner of the Butadiene Plant," Reconstruction Finance Corporation, and the grantor was "the owner of the [Lake Charles] Refinery located adjacent to the aforesaid Butadiene Plant," Cities Service Refining Corporation. *Id.* at 1. As the later owner of Butadiene Plancor 706, Oxy plays no role in a right held by the owner of the Lake Charles Refinery.

The ROW Agreement indemnity provision also states that:

> Grantee agrees to construct and maintain said pipeline in such condition that the escape of any products transported therein shall be prevented and should the property of grantor or any other corporation, person or firm be injured or destroyed thereby grantee agrees to assume and pay all damages resulting therefrom.

*Id.* at 2. Under a plain reading of this clause, the government agreed to "pay all damages resulting" from the construction and maintenance of the waste disposal systems. It does not imply carte blanche indemnification to a future owner of Butadiene Plancor 706—the plant that caused the waste coming from the system.

Further, Cities Service's later purchase of Butadiene Plancor 706 put an end to any reimbursement claim. On this point, the parties dispute whether the ROW Agreement was a benefit or burden appurtenant that "passes automatically with the property interest" and relieved the government of liability to perform, Def.'s Mot. at 23, or whether the right of way was a burden in gross that does not discharge any liability, *see* Pls.' Cross Mot. at 40–41. Neither position is dispositive on Oxy's rights under the ROW Agreement. Regardless of whether the government's obligations are benefits or burdens that would have survived a later sale, nothing

under the indemnity provision obligates payment to the owner of Butadiene Plancor 706—the grantee—let alone a future plant owner.

Plaintiffs' own Rule 30(b)(6) witness confirmed that, once the government sold Butadiene Plancor 706, "[i]f the waste were not needed for the government's operation of the butadiene plant, of which it no longer had . . . it would not be responsible for" indemnifying Cities Service under the ROW Agreement.  CFC-Appx 538–39 (Purser 30(b)(6) deposition at 41:13–42:5).  Thus, while the indemnity provision provides reimbursement for the grantor or coverage for any liability relating to negligence in operation of the right-of-way pipeline, Plaintiffs demonstrate no evidence to extend that indemnification to the future owner of the plant (and future benefiter of the pipeline).

Finally, Plaintiffs' reading of the indemnity provision to grant a right to Oxy chafes with the Anti-Assignment Act's goal of preventing duplicative obligations.  *See Johnson Controls*, 44 Fed. Cl. at 344; *United States v. Shannon*, 342 U.S. 288, 291 (1952).  Plaintiffs each claim indemnification from the same provision of the same government agreement, and Oxy seeks indemnification even though it may no longer own Butadiene Plancor 706.  *See* CFC-Appx577– 89 (Bednar 30(b)(6) deposition at 9:24–10:5); Def.'s Mot. at 9.  Conceivably, the plant's current owner could also claim reimbursement for their incurred costs.  This situation "is the very possibility of multiple claimants that the Anti-Assignment Act is intended to prohibit."  *Centers v. United States*, 71 Fed. Cl. 529, 535 (2006); *see also Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1367 (Fed. Cir. 2011) (Gajarasa, J., concurring in part and dissenting in part) (describing how a voluntary assignment "clearly implicates the mischief that the Claims Act was intended to avoid: namely, forcing the United States to deal with multiple parties, including strangers to the original transaction").

### b. The Government did not Consent to the Butadiene Plancor 706 Assignment to Oxy.

Failing under the "operation of law" exception, Plaintiffs also argue that Oxy received a valid assignment under the Anti-Assignment Act's waiver exception when Cities Service Company assigned the plant to Cities Service Oil and Gas Corporation.[9]  *See* Pls.' Cross Mot. at 9, 21–22; *Maffia*, 143 Ct. Cl. at 203 ("Despite the bar of the Anti-Assignment statute, the Government, if it chooses to do so, may recognize an assignment."); *see also Tuftco Corp.*, 614 F.2d at 745.  The Oil Companies claim that the government prospectively "consented to this partial assignment of the ROW Agreement's indemnity" when it leased Butadiene Plancor 706 to Cities Service.  *See* Pls.' Cross Mot. at 9, 21–22.  They further explain that the government signed a Butadiene Lease Agreement that included a provision authorizing Cities Service to

---

[9]  Plaintiffs argue that the government consented to the transfer of the ROW Agreement as to both Citgo and Oxy when Cities Service "prospectively consented to such assignments to subsidiaries and affiliates in the Butadiene Lease Contract."  Pls.' Cross Mot. at 9;  *see* Pls.' Cross Mot. at 9, 21.  The majority of Plaintiffs' argument applies to Citgo and is carried over to Oxy.  *See id.* at 21.

acquire "rights of way" and transfer or assign these rights under the Lease.  *Id.* at 10 (citing CFC-Appx45).  This provision held:

> Lessee will not without prior written consent of Defense Corporation sell, assign, or pledge this agreement or any of its rights or obligations hereunder, except that Lessee may make such sale, assignment, or pledge to a subsidiary or affiliated company, provided that Lessee or the parent company of Lessee shall guarantee to Defense Corporation the full performance by such subsidiary or affiliated company of all Lessee's duties and obligations hereunder and provided further that such subsidiary or affiliated company shall assume, without in any way releasing Lessee therefrom . . . all of Lessee's duties and obligations hereunder.

CFC-Appx45.

As the Oil Companies explain, the Butadiene Lease "expressly contemplated" a future easement and "additional instruments of lease," which "would have included the ROW Agreement."  Pls.' Cross Mot. at 10.  But the Butadiene Lease also required "that Lessee . . . shall guarantee to Defense Corporation the full performance" of any assignee.  *See* CFC-Appx45.  Plaintiffs have submitted no evidence that Cities Service provided any guarantee of performance for assignment of the ROW Agreement to Cities Service Oil and Gas Corporation.  Regardless of whether the Agreement's indemnity provision actually provides a right to relief for Oxy, the record does not demonstrate that the government gave consent other than the conditional consent contemplated in the Butadiene Lease.

The plain language of the Lease also requires the lessee to provide "prior *written* consent," CFC-Appx45 (emphasis added), which contrasts with Plaintiffs' contention that the guarantee requirement was "self-executing."  *See* Pls.' Sur-Reply at 3–4.  This claim by the Oil Companies would have more weight if the assignment had not occurred more than three decades after the government sold its ownership of the plant, with no evidence the government was notified.  *See Ins. Co. of the W.*, 100 Fed. Cl. at 72 ("What will determine the legitimacy of tacit consent are the circumstances surrounding the silence, particularly if rights and privileges are implicated.  It is presumed that the innocent party will speak out or otherwise respond to a possible infringement of a right or privilege.") (citing *Georgia v. South Carolina*, 497 U.S. 376, 389 (1990)); *id.* at 73 ("It is not incumbent upon the government to reserve the protections of the Anti-Assignment Acts.  Rather, the Anti-Assignment Acts protect the government unless they are clearly waived, and silence can amount to waiver only when an 'all the circumstances' review indicates such a waiver.") (citations omitted).

### c. Oxy is not Subrogated into Citgo's Position Under the Right of Way Agreement.

Finally, the Oil Companies argue that even if Oxy was never assigned rights under the ROW Agreement, "it may nonetheless be subrogated unto CITGO's position for making payments for which CITGO could have sought contractual indemnification from Defendant."  Pls.' Cross Mot. at 22.  Plaintiffs are correct that subrogation may apply where a party pays for

another's obligations and that subrogation falls within the operation of law exception to the Anti-Assignment Act.  *See id.* at 22–23; *Anchor Sav. Bank, FSB v. United States*, 121 Fed. Cl. 296, 326 (2015) ("Transfers by operation of law include transfers by . . . subrogation.") (quoting *Holland v. United States*, 62 Fed. Cl. 395, 400 (2004)).

The Federal Circuit recognizes that a plaintiff may be subrogated to an original claimant's claim when "the surety takes over contract performance or when it finances completion of the defaulted contract."  *Ins. Co. of the W.*, 243 F.3d at 1370; *see also Prairie State Nat'l Bank v. United States*, 164 U.S. 277 (1896) (upholding equitable subrogation for completing performance of a government contract under a performance bond).  But Oxy has not taken over Citgo's position under either the Avgas Contract or ROW Agreement, nor has it financed the completion of either contract.

Plaintiffs point to *First National City Bank*, which held that subrogation applies when "a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter."  Pls.' Cross Mot. at 22–23 (citing *First Nat'l City Bank v. United States*, 212 Ct. Cl. 357, 369 (1977)).  However, *First National City Bank* also required that "payment of the debt . . . result from some compulsion."  *First Nat'l City Bank,* 212 Ct. Cl. at 369.  Yet, aside from repeated assertions that Plaintiffs were required to pay for damages assessed by the State of Louisiana, the Oil Companies fail to explain why Oxy specifically was compelled to pay for costs that did not fall under its purview.  Oxy also did not "take[] over contract performance" or "finance[] completion of the defaulted contract."  *Ins. Co. of the W.*, 243 F.3d at 1370.  Any obligation imposed on Citgo for environmental cleanup stemmed not from the government's required contractual performance, but from conduct related to a contract with the government.

Accordingly, because the assignment of Butadiene Plancor 706 did not to pass to Oxy by any valid exception to the Anti-Assignment Act—operation of law, consent, or subrogation—the assignment was made against the Anti-Assignment Act prohibition.  The Act therefore "annuls the contract . . . so far as the Federal Government is concerned."  41 U.S.C. § 6305(a).  Any rights under the ROW Agreement identified in Plaintiffs' final count are dismissed as to Oxy, and Oxy is dismissed as a plaintiff.

## B.    Claims and Liability Under the Avgas Contract and Right of Way Agreement

The Government next moves to dismiss Plaintiffs' claims under the Avgas Contract and ROW Agreement because Cities Service released the United States from liability under subsequent settlements or mutual release agreements.  *See* Def.'s Mot. at 19–21.  Plaintiffs cross-move for partial summary judgment as to the government's liability on three counts related to the Avgas Contract and ROW Agreement.  In Counts I and II, Plaintiffs assert a breach of contract claim and compensation for costs incurred under the Avgas Contract.  Compl. ¶¶ 35–47.  Under Plaintiffs' final count, the Oil Companies assert a breach of contract claim to recover costs incurred under the ROW Agreement.

1. **The Avgas Contract**

Under the Avgas Contract, the United States must pay:

> any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller *may be required by any municipal, state, or federal law* in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.

Compl. Ex. A at 11, ECF No. 1-3 (Avgas Contract).

Plaintiffs argue that this provision is materially identical to an avgas contract granting indemnification in *Shell Oil I*. *See* Pls.' Cross Mot. at 24 (citing 751 F.3d at 1285). In that case, Shell's avgas contract contained indemnification for "any new or additional taxes, fees, or charges . . . which Seller may be required by any municipal, state, or federal law . . . to collect or pay." *Shell Oil I*, 781 F.3d at 1285. The Federal Circuit held that the contract "require[d] the Government to reimburse the Oil Companies for their CERCLA 'charges'" and entitled them to summary judgment as to contractual liability. *Id.* at 1285, 1302.

The Government does not dispute the language of the Avgas Contract nor distinguish *Shell Oil I*. Rather, it argues that the United States is no longer required to indemnify Citgo because both parties "agreed to a 'final and complete settlement of all claims . . . by reason of termination of the [avgas] contract." Def.'s Mot. at 19 (citing CFC-Appx4). This Court recognizes "final and complete" settlement agreements when the settlement is "necessarily future oriented," and the Government asserts that this condition is satisfied here. *Chevron USA v. United States*, 155 Fed. Cl. 344, 352–53 (2021) (quoting *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999)); *see also Ford Motor Co. v. United States*, 378 F.3d 1314, 1322 (2004) (Schall, J., dissenting); *see* Def.'s Mot. at 20.

### a. The Avgas Contract's Indemnification Provision Covers CERCLA Costs.

Generally, "courts have held that indemnification provisions entered into between private parties prior to the passage of CERCLA may cover costs assessed pursuant to that statute." *Ford Motor*, 378 F.3d at 1321 (Schall, J., dissenting) (collecting cases); *see also, e.g.*, *Dent v. Beazer Materials & Servs., Inc.*, 156 F.3d 523, 534 (4th Cir. 1993); *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir. 1994), *cert. denied*, 514 U.S. 1065 (1995). To cover CERCLA costs, multiple circuits hold that indemnification language "must either be 'specific enough to include CERCLA liability or general enough to include any and all environmental liability.'" *Ford Motor*, 378 F.3d at 1321 (quoting *Beazer, E.*, 34 F.3d at 211) (dissent collecting cases and describing standard); *DuPont*, 365 F.3d at 1373; *see also Shell Oil Co. v. United States*, 108 Fed. Cl. 422, 433 (2013). "The key is whether the indemnity contains limiting language, or whether it demonstrates an intent to allocate *all* possible liabilities among the parties. If there is limiting language in the indemnity, without a specific provision for CERCLA costs, it does not encompass them." *Ford Motor*, 378 F.3d. at 1321 (citations omitted). In *Ford Motor*, the

Federal Circuit held that an indemnity provision between Ford and the Government "explicitly refer[red] to unknown costs" and "include[d] all claims 'not now known,'" ultimately concluding that later CERCLA claims were reimbursable.  *Id.* at 1319–20.

Other cases follow a similar track.  In *DuPont*, the Federal Circuit reviewed an indemnification clause in another WWII-era contract that resulted in significant environmental liability.  365 F.3d at 1369.  This indemnification clause agreed "to hold [DuPont] harmless against any loss, expense (including expense of litigation), or damage . . . of any kind whatsoever" as long as it was connected to work under the contract.  *Id.* at 1372.  The Circuit held that the indemnity language was sufficiently broad to include CERCLA liability.

Though the language of the Avgas Contract is not "specific enough to include CERCLA liability," it is likely "general enough to include any and all environmental liability."  *Id.* at 1373.  As stated above, "the key is whether the indemnity contains limiting language."  *Ford Motor*, 378 F.3d at 1321.  Here, the indemnification provision lists a wide category of costs ("additional taxes, fees, or charges") in various contexts ("which may be required by any municipal, state, or federal law in the United States or foreign country").  *See* Compl. Ex. A at 11.  Nevertheless, the Federal Circuit has cautioned that CERCLA liability is compelled only when the "limitless language was sufficiently broad."  *Ford Motor*, 378 F.3d at 1323 (dissent describing standard); *see also Shell Oil I*, 751 F.3d at 1303–06.

*Shell Oil I* clarifies that "any new or additional taxes, fees, or charges" in the Avgas Contract is broad enough to include CERCLA costs.  751 F.3d at 1292–93.  There, the Federal Circuit held that "CERCLA is a federal law requiring responsible parties to pay the 'costs of removal or remedial action,' and is thus a charge (i.e., cost) imposed by federal law.  The plain language of the new or additional charges provision thus requires the Government to indemnify." *Id.* (citations omitted).  A different interpretation of the Avgas Contract might question construing "a straightforward 'Taxes' clause into a catch-all indemnification provision."  *Id.* at 1306 (Reyna, J., dissenting).  But this argument has been made and lost.  *Id.*

Under *Shell Oil I*:

The Oil Companies agreed to the avgas contacts' low profits in return for the Government's assumption of certain risks outside of the Oil Companies' control. The CERCLA charges in this case are one such risk. . . . These circumstances confirm that the new or additional charges provision must be interpreted to require reimbursement for the Oil Companies' CERCLA costs arising from avgas production.

*Id.* at 1296.  Because the instant case includes a near-identical indemnification provision in a near-identical contract for avgas production of , the same finding of liability applies.

### b.  The Final Avgas Settlement did not Release All of Citgo's Contractual Claims.

Next, the Government asserts that a 1947 settlement agreement and mutual release (the "Avgas Settlement") between Cities Service and the United States—which was termed a "final

and complete settlement"—releases the government from all liability. Def.'s Mot. at 20. In contrast, Plaintiffs argue that the settlement agreement was "limited in scope and solely related to a wind-down of the war effort." Pls.' Cross Mot. at 24. They explain that the Avgas Contract was meant to last until 1947, but that on the day following the Japanese surrender and cessation of hostilities in August 1945, the United States notified Cities Service that it was terminating the contract. *Id.* at 24–25. This early termination was a contractual breach. *Id.* In line with this backstory, Plaintiffs contend that the Avgas Settlement only related to settling the breach of contract, not all future claims. *See id.* at 28. In defense of this argument, they rely on several examples—the Avgas Contract's recital clauses, the contract's alleged failure to comply with the Contract Settlement Act of 1944, and the lack of prospective language in the Avgas Settlement. *Id.*

The Supreme Court has held that "[i]f the parties intend to leave some things open and unsettled" in a mutual release, "their intent to do so should be made manifest." *see United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907). To ascertain this intent, the Federal Circuit instructs courts to consider whether a mutual release or settlement agreement uses broad, general language to settle claims. *Augustine Med.*, 194 F.3d at 1372 (citing *William Cramp*, 206 U.S. at 128). If so, that broad language "constitute[s] a waiver of all claims and causes of action 'arising under or by virtue of the contract' and of all 'claims based upon events occurring prior to the date of the release.'" *Id.* (cleaned up) (first citing *William Cramp*, 206 U.S. at 128; and then *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct. Cl. 313, 315 (1976)). These releases extend only to "all present, but not future claims." *Chevron*, 155 Fed. Cl. at 352; *see also Augustine Med.*, 194 F.3d at 1373.

To release liability based on events occurring after the date of the general release, this Court requires that the release "either expressly refer to future claims or include language that indicates prospective application." *Chevron*, 155 Fed. Cl. at 352 (citing *Augustine Med.*, 194 F.3d at 1371). The latter requires language that is "necessarily future-oriented" such that "it implies a *future possibility* of [the plaintiff] having a claim." *Augustine Med.*, 194 F.3d at 1371.

For example, the *Ford Motor* case involved a similar claim from a manufacturer under a WWII contract seeking later indemnification for CERCLA costs. *See* 378 F.3d at 1314. There, the car manufacturer settled with the United States but left open certain "costs reimbursable under the Contract . . . but which are not now known [to Ford]." *Id.* at 1318. The *Ford Motor* court concluded that the "not now known" language did not bar later-imposed CERCLA reimbursement costs "merely because the originating events are long past, for the liability for cleanup did not arise until after the enactment of CERCLA and other environmental laws, and the claim was timely made after it arose." *Id.* at 1319–20. The "not now known" language provided "no temporal limit as to when the claims would become known," and thus expressly preserved the right to indemnification in the future. *Id.* at 1319; *see also Augustine Med.*, 194 F.3d at 1370–71 (holding that a general release of "any and all manner of action or actions" was a prospective release that barred future claims); *Chevron*, 155 Fed. Cl. at 352 (following *Augustine Medical* to hold that future environmental claims were not released).

The Government compares the Avgas Settlement here to *Ford Motor* as a basis for barring indemnification. *See* Def.'s Mot. at 20. "Contract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States*, 925 F.2d 1271, 1274 (Fed. Cir. 1991); *see also Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991) ("[T]he plain and unambiguous meaning of a written agreement controls."). "If a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning." *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 748 (2005) (collecting cases).

The Avgas Settlement was signed in 1947—decades before CERCLA was passed and before the environmental liability accrued. The mutual settlement includes recitals that outline the start and end dates of the Avgas Contract. CFC-Appx2–4. Next, it provides that RCF will compensate Cities Service for their lost investment and includes promises related to other costs. *Id.* It ends by stating:

> This agreement shall not affect the claims of Cities Service to RFC in connection with expenses of settling the sub-contract claim of Warren Petroleum Co. and Southern Minerals Company. *With these exceptions, this agreement constitutes final and complete settlement of all claims of Cities Service by reason of termination of the contract of June 16, 1942, as amended.*

CFC-Appx4 (emphasis added).

The Avgas Settlement delineates exceptions to which claims are reserved, which evinces some intent to settle remaining claims. *See id.* Nonetheless, it limits "final and complete settlement of all claims" to those "by reason of termination of the [Avgas] contract of June 16, 1942." *Id.* This comports with the Oil Companies' understanding that the release was limited only to settling the early breach of contract in 1945. *See* Pls.' Cross Mot. at 28. Rather than release all claims, the mutual release in the Avgas Settlement was limited to the breach of contract stemming from the government's early termination. Though the final settlement may sound "necessarily future-oriented," it does not apply to all outstanding claims between the parties. Indeed, the Avgas Settlement also contained the recital that "Cities Service has presented to RFC on February 19, 1945 a claim for damages allegedly sustained by Cities Service as a result of such termination." *Id.* (citing CFC-Appx1).

The Government attempts to read-in language from the Contract Settlement Act and asserts that the Avgas Settlement must be read to cover "any other claim under a terminated war contract." Def.'s Reply at 17–18. But there is no evidence of this in the Avgas Settlement itself or a need to look outside the agreement. *Shell Oil I* is again instructive. There, the Federal Circuit reiterated that "[o]nce the facts of breach are established, the defendant has the burden of pleading and proving any affirmative defense that legally excuses performance." *Shell Oil I*, 751 F.3d at 1289 (quoting *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1360 (Fed. Cir. 2009)). Further, the Contract Settlement Act "allows post-termination indemnification claims, such as the Oil Companies' claims on the terminated avgas contracts, so long as the expenditure arose on account of the contractor's performance under the contract, and the expenditure is not otherwise excluded from payment by other provisions." *Id.* (quoting *Ford Motor*, 378 F.3d at 1320) (quotation marks omitted). Contract termination is not the same as a

general release, and the Government has not proven that the Avgas Settlement here covered Citgo's indemnification claims for CERCLA liability.

### c. Citgo is Entitled to Relief and Partial Summary Judgment as to the Government's Liability Under the Avgas Contract.

The Oil Companies have demonstrated that Citgo is entitled to indemnification under the Avgas Contract, and that the Avgas Settlement only released claims for early termination of the war contract—not all indemnification claims related to environmental liability. This establishes a sufficient claim to relief, and the Government's motion to dismiss the Avgas Contract claim under RCFC 12(b)(6) is denied. *Iqbal*, 556 U.S. at 678.

Additionally, Plaintiffs move for partial summary judgment as to "certain elements of liability: (1) a finding that there were valid contracts between the parties, and (2) the Government's duties to Plaintiffs arising out of these contracts." Pls.' Sur-Reply at 29. On this point, the Government argues that the timing is inappropriate for summary judgment because additional discovery is needed. Def.'s Reply at 38–40. It correctly points out that, under *Shell Oil II*, plaintiffs can only prevail in a breach of contract claim if they demonstrate "a valid contract between the parties, a duty arising out of that contract, a breach of that duty, and damages caused by the breach." *Chevron*, 155 Fed. at Cl. 353 (citing *Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 34 (2017), *aff'd*, *Shell Oil II*, 896 F.3d 1299; *see* Def.'s Reply at 35. The Government contends that none of these factors have been met and that additional discovery is warranted into whether any of the Oil Companies' environmental remediation costs were incurred under the related contracts. Def.'s Reply at 35. The Government also claims that further discovery is required to establish "affirmative defenses that the United States intends to raise should the Court deny our motion to dismiss," including contributory negligence or setoffs due to insurance. *See id.* at 35, 38–40.

This Court's August 4, 2020 Order instructed the parties to undertake liability discovery; it excluded damages discovery, which the Court defined as issues related to "offset claims or defenses, the nature, timing and amounts of any releases of pollution or waste at the Lake Charles Facility, and the size and scope of remediation areas at the Lake Charles Facility." *See* Aug. 4, 2020 Order, ECF No. 30. Through liability discovery, Citgo has demonstrated that there is no genuine dispute as to any material fact on the Avgas Contract. *See Alamanza*, 935 F.3d at 1336–37. Therefore, it is entitled to a finding of liability as to the validity of the Avgas Contract, its indemnification under the Avgas Contract, and the inapplicability of the Avgas Settlement. Partial summary judgment as to liability on those bases is granted in Citgo's favor as to Counts I and II. Any issues related to "offset claims or defenses, the nature, timing and amounts of any releases of pollution or waste at the Lake Charles Facility, and the size and scope of remediation areas at the Lake Charles Facility" are preserved for further discovery and litigation. *See* Aug. 4, 2020 Order.

### 2. The Right of Way Agreement

The Right of Way Agreement gave the United States permission to build a pipeline connecting its rubber plant, Butadiene Plancor 706, to a Surge Pond located at Cities Service's Lake Charles Refinery. It also agreed:

to construct and maintain said pipeline in such condition that the escape of any products transported therein shall be prevented and should the property of grantor or any other corporation, person or firm be injured or destroyed thereby *grantee also agrees to assume and pay all damages resulting therefrom*, *and grantee also agrees to indemnify grantor* for losses, claims, demands and suits for damages to property and injury to or death of persons, including court costs and attorneys' fees, incident to or resulting from grantee's exercise of the rights herein granted.

Compl. Ex. C at 2 (emphasis added); *see also* Compl. ¶ 27.

### a. The Right of Way Agreement's Indemnification Provision Covers CERCLA Costs.

Similar to the Avgas Contract's indemnification provision, the Government does not meaningfully dispute Citgo's claim for reimbursement of environmental costs stemming from remediation of the Surge Pond under the ROW Agreement. *See* Def.'s Mot. at 24. Likewise, the question here is whether the indemnification language is "specific enough to include CERCLA liability or general enough to include any and all environmental liability." *DuPont*, 365 F.3d at 1373.

The Contract "agrees to assume and pay all damages" and "agrees to indemnify grantor for losses, claims, demands and suits for damages to property." Compl. Ex. C at 2. The language does little to limit the broad scope of potential liability. Indeed, "all damages" is "general enough to include any and all environmental liability." *Ford Motor*, 378 F.3d at 1321–22. Once again, *Shell Oil I* is dispositive. There, the government had a duty to reimburse "any new or additional . . . charges . . . by reason of the production, manufacture, sale or delivery of avgas." *Id.* (citing *Shell Oil I*, 751 F.3d at 1292). Here, the ROW Agreement indemnifies costs "incident to or resulting from" the operation of the government exercise of the Butadiene Plant Effluent Disposal System. *Id.* As Plaintiffs point out, this language is markedly broader than the indemnification upheld in *Shell Oil I*. Pls.' Cross Mot. at 30. Accordingly, the ROW Agreement's indemnification provision covers CERCLA and related environmental cleanup costs.

### b. The Mutual Release of Butadiene Production Claims Released Citgo's Contractual Claims Under the Right of Way Agreement.

Instead of contesting the ROW Agreement itself, the Government claims that, similar to the Avgas Contract, a 1957 settlement agreement (the "Mutual Release") bars Plaintiffs' reimbursement request. *See* Def.'s Mot. at 20. It maintains that Cities Service Refining Corporation "released the United States from all past or future claims that it 'may have' 'in connection with' the Government's operation of the butadiene facility," and that Plaintiffs therefore fail to state a claim for relief. *Id.* at 21 (quoting CFC-Appx30–31). Again, the question is whether the release is enforceable against prospective claims because it "either expressly refer[s] to future claims or include[s] language that indicates prospective application." *Chevron*, 155 Fed. Cl. at 352 (citing *Augustine Med.*, 194 F.3d at 1371).

In 1955, the United States sold Butadiene Plancor 706 to a joint venture that included Cities Service. *See* Def.'s Mot. at 6, 17; Compl. Ex. D at 8. In 1957, the government and Cities Service signed a Mutual Release related to outstanding Butadiene Plancor 706 claims. The agreement ended with the following recital:

> Cities, in consideration of the foregoing release granted to it by FFC [Federal Facilities Corporation, an instrumentality of the United States], does, in addition to the aforesaid payment made by it to FFC, hereby releases and forever discharges the United States, FFC and all other Federal Agencies, of and from any and all claims, causes of action and demands whatever which it may now or hereafter, either in law or in equity, against the United States, FFC, or any other Federal Agency, as a result of, or in connection with, the operation of the said Facility Plancor 706 under the Operating Agreement SR 37, as amended.

CFC-Appx30–31. The parties dispute the context of this agreement. First, the Oil Companies challenge whether the agreement ever applied to the butadiene plant, arguing that the release was limited to disputes over employee benefit plans. *See* Pls.' Cross Mot. at 31.

In resolving this dispute, the "plain and unambiguous meaning of the written agreement controls." *Craft Mach. Works, Inc.*, 926 F.2d at 1113 (Fed. Cir. 1991). The Mutual Release includes multiple relevant recitals. First, as the Oil Companies correctly note, the Release describes:

> In the negotiations for making final settlement under the terms of the Operating Agreement SR 37, as amended, there arose between FFC and Cities controversies relative to the Vacation, Retirement and Thrift Plans instituted for the benefit of employees who had been engaged in the operation of the Facility Plancor 706.

CFC-Appx29.

The Mutual Release also reserves certain claims: "Cities is not released or discharged from those obligations, liabilities, and rights which may exist with respect to technical information and patents under the said Operating Agreement, as amended, and under the Butadiene Lease Contract." CFC-Appx30. This provision counters Plaintiffs' claim that the Mutual Release was limited to employee benefit plans; if so, the release would have no reason to clarify that a larger subset of claims were excluded from release.

Next, Plaintiffs assert that this paragraph on technical information reserves claims under the ROW Agreement. *See* Pls.' Sur-Reply at 19. Contrary to Plaintiffs' argument, this provision does not limit the application of "technical information and patents" to just those rights reserved "under the operating agreement." *See id.* Instead, the plain language of this provision reserves "those obligations, liabilities, and rights which may exist with respect to technical information and patents" under both the Operating Agreement and Butadiene Lease—which is why "under" appears twice. CFC-Appx30.

Plaintiffs read this provision as only reserving those "obligations, liabilities, and rights" "with respect to technical information and patents" under the Operating Agreement, but as

reserving all rights under the Butadiene Lease.  *See* Pls.' Sur-Reply at 19.  But this disjointed reading arbitrarily segments the first clause in half where there is no comma, divider, or other indication that the series should be limited.  Rather, "obligations, liabilities, and rights" is limited by "with respect to technical information and patents," under both the Operating Agreement and the Butadiene Lease.  *See Anthem Builders, Inc v. United States*, 121 Fed. Cl. 15, 28 n.23 (2015) ("Where there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier *normally applies to the entire series*.") (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 147–51 (2012)).

Plaintiffs' reading would also result in no limit on the rights that are reserved under the Butadiene Lease, which renders "under" meaningless and buries a plenary reservation of rights at the end of a limited series of reservations.  *See Abraham v. Rockwell Intern. Corp.*, 326 F.3d 1242, 1254 (Fed. Cir. 2003) ("Specific terms and exact terms are given greater weight than general language.") (quoting Restatement (Second) of Contracts § 203(c) (1981)); *accord Bennett v. Spear*, 520 U.S. 154, 173 (1997) (describing duty to "give effect, if possible, to every clause and word of a statute").

Lastly, contrary to Plaintiffs' assertion, the Butadiene Lease Contract does mention "technical information," such as the submission of "plans, designs, specifications and schedules as may be required for the construction and equipment of the butadiene plant."  CFC-Appx39.  The Oil Companies are correct that the Lease does not appear to mention patents, but this term is also not included in the Operating Agreement either, solidifying the reservation of these rights that "*may* exist," not ones that did currently exist.  CFC-Appx30; *see* CFC-Appx48–71.  Thus, the plain language only reserves limited rights unrelated to indemnification under the ROW Agreement.

After discussing employee benefit plans and technical information, the Mutual Release states an intent to release all claims.  It notes that "the parties have agreed to compromise and settle their respective claims growing out of said Operating Agreement SR 37" and "release by each of the other from any and all claims and demands whatsoever that may have arisen, or may hereafter arise, in connection with, or as a result of, the operation of the Facility Plancor 706 by Cities Service under the terms of said Operating Agreement 37."  CFC-Appx29.  Further in, the Release provides a broad release of the government's claims:

> FFC . . . does, by these presents, release and forever discharge Cities, its affiliates, successors and assigns, of and from any and all claims, causes of action and demands whatsoever, which it or the United States may now or hereafter have, either in law or in equity, against Cities, its affiliates, successors and assigns, or any of them, as result of, or in connection with, the operation by Cities of the Facility Plancor 706, under the Operating Agreement SR 37.

CFC-Appx30.  Finally, it provides similarly broad language for Cities Service's claims, affirming that the company does "hereby release and forever discharge the United States . . . from any and all claims, causes of action and demands whatever which it may now or hereafter have . . . as result of, or in connection with, the operation of the said Facility Plancor 706, under the Operating Agreement SR 37."  *Id.*

The language "release and forever discharge . . . from any and all claims . . . now or hereafter," *id.*, is sufficiently "future-oriented" to imply that Cities Service may have prospective claims. *Augustine Med.*, 194 F.3d at 1371. Nevertheless, the Release expressly refers to the prospective application of this future claim and then releases liability. *See Chevron*, 155 Fed. Cl. at 352. And it goes far beyond the "not now known" language of *Ford Motor*, with three invocations of future tense. Under the standards set forth in *Augustine Medical* and *Ford Motor*, this constitutes a release of liability for future events.

The Oil Companies emphasize that the release clause included "under the Operating Agreement," as opposed to application of the ROW Agreement. Pls.' Cross Mot. at 31. This contention is unpersuasive. The Operating Agreement actually governed the plancor's operation. The ROW Agreement granted an easement for the installation of a system "for the disposal of boiler blowdown and softener sludge" stemming from plant operation by the Operating Agreement. Compl. Ex. C at 1. And it again invokes the Operating Agreement in stating "grantee's exercise of the rights herein granted"—i.e., rights to remove waste from plant operations. *Id.* at 2. Ostensibly, Citgo's claim for indemnification under the ROW Agreement extends to costs "resulting from grantee's exercise" of the Butadiene Effluent Disposal System from operation of the butadiene plant, and not from costs resulting from only "the construction maintenance and operation of such pipeline" as an instrument of the Lease. *Id.* Plaintiffs cannot have it both ways, where the ROW Agreement's indemnification covers cleanup charges resulting from operation of Butadiene Plancor 706, but where the release of "any and all claims . . . as a result of, or in connection with, the operation of the said Facility Plancor 706" would not include the operation of the plant itself. CFC-Appx30.

Moreover, Plaintiffs acknowledge the interplay between the various agreements covering Butadiene Plancor 706. Plaintiffs characterize the ROW Agreement as a "stand-alone document" in light of the Operating Agreement and various iterations of the Butadiene Lease. Pls.' Cross Mot. at 35. However, they also argue that "[t]he ROW Agreement was incorporated into, and is not separate from, the Lease." Pls.' Sur-Reply at 20 n.13; *see also* Pls.' Cross Mot. at 31–32, 35; Pls.' Sur-Reply at 20 ("[T]he Lease expressly recognized that such instruments like the ROW Agreement would be executed and incorporated into the Lease, and in this case, must control the parties' subsequent obligations."); Oct. 3, 2022 Hr'g Tr. at 56:19–21.

The Operating Agreement, entered into just one month after the Butadiene Lease, also recognized that it extended from the Lease. *See* CFC-Appx49 ("[U]nder the terms of the Butadiene Lease Contract, Contractor has further agreed to become the lessee of the Butadiene Plant."); CFC-Appx69 ("This contract shall automatically terminate upon cancelation or termination of the Butadiene Lease Contract."). While each of these documents—the ROW Agreement, Butadiene Lease, and Operation Agreement—are different, operation of the plant could not have occurred without each of them. The documents also do not consistently refer to one another. Plaintiffs correctly note that the ROW Agreement does not mention the Operating Agreement, but fail to recognize that the ROW Agreement similarly does not mention the Lease.

Despite this gap, the interplay of the three documents is clear: it is the Operating Agreement that controls the production of butadiene and resulting production of waste. By contrast, the ROW Agreement contains the easement controlling disposal of that waste. The agreement reflects that Cities Service's operation of the butadiene plant necessitated a system

whereby the RFC "approved a project covering the construction and installation of a Butadiene Plant Effluent Disposal System." Compl. Ex. C at 1, 2. The operation of this system as an ancillary to the larger plant operations directed by the Operating Agreement plainly falls within causes of action "as a result of, or in connection with, the operation of the said Facility Plancor 706, under the Operating Agreement SR 37."

### c. Citgo is not Entitled to Relief or Partial Summary Judgment as to the Government's Liability Under the Right of Way Agreement.

Plaintiffs have not demonstrated that Cities Services released prospective claims against the government stemming from Butadiene Plancor 706's operation, which encompassed the ROW Agreement. The Government moved to dismiss the ROW Agreement claim because of the mutual release. *See* Def.'s Mot. at 20–21. When discovery outside the pleadings is presented on a motion under RCFC 12(b)(6), "the motion must be treated as one for summary judgment under RCFC 56." RCFC 12(d); *see Advanced Cardiovascular Sys. Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1164 (Fed. Cir. 1993); *Ríos-Campbell v. U.S. Dep't of Commerce*, 927 F.3d 21, 24 (1st Cir. 2019) ("When . . . substantial discovery has taken place, the plausibility standard [ends].").

To grant summary judgment as to Citgo's indemnification under the ROW Agreement, the Oil Companies bear the burden of demonstrating the absence of a genuine dispute of material fact and must show an entitlement to judgment as a matter of law. RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs have established that the ROW Agreement contains an indemnification clause that would reimburse Citgo for CERCLA liability stemming from the government's operation of the Effluent Disposal System from Butadiene Plancor 706. However, for the reasons stated above, Plaintiffs have not proven entitlement to indemnification because any surviving claims under the ROW Agreement were released by Cities Service. Accordingly, partial summary judgment as to liability under the ROW Agreement is denied as to Plaintiffs and granted in favor of the United States.[10]

## IV.   Conclusion

At this stage in the litigation, discovery is still required as to the full extent of pollution at the Lake Charles Refinery Complex and Citgo's incurred remediation costs. *See* Aug. 4, 2020 Order. "If history serves a purpose in this case, it is to show that in the 1940s, as today, avgas production results in byproducts," some of which helped the war effort, and "some of which are wastes." *Shell Oil I*, 751 F.3d at 1307 (Reyna, J., dissenting). The United States and the Oil Companies are still handling the aftermath and likely will do so for some time. Given the

---

[10]   In addition to the Mutual Release, the Government argues that the Butadiene Lease agreement contains its own liability provision which holds the United States "harmless against any liability whatsoever because of accidents or injury to persons or property because of the operation of the plant, its easement, or rights of way." CFC-Appx43–44; *see* Def.'s Mot. at 21. The Government also claims that the Anti-Deficiency Act bars open ended indemnity provisions like that under the ROW Agreement. Def.'s Mot. at 24. However, these arguments are moot because Citgo has not established its entitlement to indemnification as a matter of law based on the mutual release.

ongoing nature of this matter, the parties would be well advised to consider a dispute resolution process to address costs and damages moving forward rather than continuing to litigate these matters.

For the reasons set forth above, the Court issues the following rulings:

1. Defendant's Motion to Dismiss Plaintiffs' breach of contract claims under the Avgas Contract (Counts I and II) is **DENIED**;

2. Defendant's Motion to Dismiss Plaintiffs' breach of contract claim under the ROW Agreement (Count V) is **GRANTED** as to Oxy USA and **GRANTED** as to Citgo Petroleum; Plaintiff Oxy USA's claims are **DISMISSED**, and Oxy USA is **DISMISSED** from the case;

3. Plaintiffs' Motion for Summary Judgment on Liability for indemnification under the Avgas Contract (Counts I and II) is **GRANTED**;

4. Plaintiffs' Motion for Summary Judgment on Liability for indemnification under the Right of Way Agreement (Count V) is **DENIED**; Defendant's Motion for Summary Judgement on Liability for indemnification under the Right of Way Agreement is **GRANTED**.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge